**In re Harvey E. ERICKSON, Jr., Paula L. Erickson, Debtors.**

**Bankruptcy No. 94–11556DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 25, 1995.

---

Jay C. Glickman, Rubin, Glickman and Steinberg, Lansdale, PA, for debtors.

Edward Sparkman, Standing Chapter 13 Trustee, Philadelphia, PA.

Ina S. Weiner, Dist. Counsel, IRS, Philadelphia, PA, for IRS.

Jack K. Miller, Miller & Miller, Philadelphia, PA, for debtor in *In re Huddy*, Bankruptcy No. 94–16326DAS (Bankr.E.D.Pa.), which raises a similar confirmation issue.

Andrew L. Markowitz, Lahaska, PA, for 1st Nat'l Bank of Chicago in *Huddy* case.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The issue presented by the instant joint Chapter 13 case is whether a plan which contemplates nominal payments and the sale of the Debtors' realty within an indeterminate period can be confirmed. Since the Debtors' Amended Plan before us ("the Plan") is vague in relating any specific terms or commitments of the Debtors and this court has indicated that no further extensions to amend the Plan would be given, confirmation is denied and this case will be dismissed if it is not promptly converted to a Chapter 7 case by the Debtors.

### B. FACTUAL AND PROCEDURAL HISTORY

HARVEY E. ERICKSON, JR. ("the Husband") and PAULA L. ERICKSON (with the Husband, "the Debtors") filed the instant joint Chapter 13 bankruptcy case on March 22, 1994. On March 28, 1994, the Debtors filed a Chapter 13 Plan which provides that

future earnings of the [Debtors] are submitted to the supervision and control of the trustee and the *debtor—debtor's employer* [sic] shall pay to the trustee the sum of $50.00 *monthly* for a period of 12 months, and the balance to be paid from the proceeds of the sale of the real property located at 817 Hartley Place, Lansdale, PA ["the Realty"].

From these proceeds, the Standing Chapter 13 Trustee, EDWARD SPARKMAN, ESQUIRE ("the Trustee"), was to pay in full all allowed secured claims and certain listed priority claims, and pay all other priority and unsecured creditors *pro rata*.

The confirmation hearing in this case was originally scheduled to take place on August 18, 1994. When the Trustee reported that the plan could not be confirmed on that date, the confirmation hearing was continued to September 22, 1994, the date that an anticipated motion, filed by the Trustee on September 2, 1994, to dismiss this case on the grounds that payments were not being made and that the plan was not feasible ("the TMTD") could be listed.

The hearings on both confirmation and the TMTD were continued again, without hesitation on our part, until October 20, 1994. On October 19, 1994, the Debtors filed the Plan at issue, which merely added the Commonwealth of Pennsylvania to the list of creditors paid *pro rata*. Upon advice of the Debtors' counsel that he would promptly file an Objection to the proof of claim of the Internal Revenue Service ("the IRS") to render the plan feasible and that a sale of the Debtors' property was a feature of the Plan, we indicated that we would not allow the contingency of a sale to delay the confirmation process indefinitely. Accordingly, we entered an Order of October 21, 1994, as amended on October 31, 1994, requiring prompt filing and service of any objection to the IRS's claim and a final date for hearings on confirmation, the TMTD, and any pleading filed regarding IRS's claim on December 8, 1994; and further stating that "[n]o further continuances shall be favored in this case and it may be dismissed on December 8, 1994, if the Plan cannot be confirmed on that date."

On December 8, 1994, we were advised that the matter with the IRS had been resolved, but that the filing of a further amended plan would be necessary to achieve confirmation. After that hearing, we entered an Order of December 8, 1994, requiring a prompt filing and success of a further amended plan; rescheduling the hearings on confirmation and the TMTD on January 19, 1995; and further stating, in light of the warnings in our October 21, 1994, Order, that "[n]o further continuances shall be granted, and this case will be dismissed on January 19, 1995, if the Plan cannot be confirmed on that date."

On January 19, 1995, the Debtors' counsel reported that his settlement with the IRS did not necessitate the filing of a further amended plan, and hence none had been filed. The Trustee, though acting consistently with a practice of confining oppositional positions to only those few cases with which he has serious problems, pressed the TMTD as to feasibility. The Trustee contended that the Plan was too vague in reciting details of the sale and indicating the consequences of the failure of a sale to occur, and too niggardly in providing for only twelve (12) months of $50 payments, for it to be confirmed.

The Husband took the stand and testified that the Realty was valued at $155,000 to $160,000 and was subject to liens totalling $112,596.18. He stated that he was confident that he could sell the Realty within one year from October 19, 1994, the date of the filing of the Plan and hence the date that he believed was a benchmark in the Plan, and have ample proceeds to pay all his creditors in full. If the sale did not occur in that time, he indicated that he was willing to allow the Debtors' case to be dismissed or converted to a Chapter 7 case.

When asked about prior efforts to sell the Realty, the Husband stated that it had been on the market since December 1993, listed at $174,900. Only one offer, at $135,000, had been made, and this had been summarily rejected by the Debtors as too low. The Husband claimed that future sales would nevertheless be stimulated by his having made certain cosmetic improvements to the Realty's interior and the Debtors' reduction of their asking price for the Realty to $163,900. The Husband also stated that he was currently paying the first and second mortgages on the Realty, but not the third mortgage. Finally, he testified that he now had two jobs and was earning enough to make payments, while acknowledging that income from the sole employment listed on his

Schedules had been disappointing, resulting in payment delinquencies in the past.

## C. DISCUSSION

The only appellate court to rule on the issue, the Ninth Circuit's Bankruptcy Appellate Panel ("the BAP"), has repeatedly refused to approve confirmation of any Chapter 13 plans dependent upon sales of debtors' residential realty as unconfirmable on the basis that such plans violate 11 U.S.C. §§ 1322(b)(2) and (b)(5). *In re Proudfoot*, 144 B.R. 876, 877–79 (9th Cir. BAP 1992); and *In re Gavia*, 24 B.R. 573, 574–75 (9th Cir. BAP 1982). Other courts have also condemned such plans generally, based on the theory that such plans violate the feasibility requirement of 11 U.S.C. § 1325(a)(6). *See In re Hogue*, 78 B.R. 867, 872–74 (Bankr. S.D.Ohio 1987); and *In re Anderson*, 21 B.R. 443, 446 (Bankr.N.D.Ga.1981).

On the other hand, other courts have, without extended discussion of the issue, refused to deny confirmation of plans solely because they feature sales of debtors' realty. *See In re Vanasen*, 81 B.R. 59, 61–62 (D.Ore.1987); *In re Smith*, 51 B.R. 273, 274–75 (Bankr. D.D.C.1984); *In re McCann*, 27 B.R. 678, 679–80 (Bankr.S.D.Ohio 1982); and *In re Anderson*, 18 B.R. 763, 764–65 (Bankr. S.D.Ohio 1982).

In this district, Chief Judge Emeritus Twardowski first addressed the issue in *In re Ratmansky*, 7 B.R. 829, 832 (Bankr.E.D.Pa. 1980), holding that

> a debtor under Chapter 13 need not have a regular source of income because section 1322(b)(8)[1] states that a Chapter 13 plan may provide for payments to the unsecured creditors from the sale of the debtor's property rather than from the debtor's future income.

However, the ultimate disposition of *Ratmansky*, at *id.*, is less comforting to the Debtors:

While this is true, the debtor has offered no proof that he intends to sell his property. On the other hand, the debtor's Chapter 13 plan and statement were not introduced into evidence in the proceeding dealing with the motion to dismiss and, consequently, there is no evidence from which we can conclude that the debtor proposes to do anything other than make payments to the trustee from his future income. Thus, the debtor's argument under section 1322(b)(8) is of no avail.

Following *Ratmansky*, Judge Twardowski denied confirmation of a "sale plan" in a case in which the debtor failed to provide evidence regarding either his future earning capacity or details relating to any planned sale of his realty in *In re Seem*, 92 B.R. 134, 135–36 (Bankr.E.D.Pa.1988).

This court has indicated its unwillingness to accept the blanket condemnation of deferral of plan payments set forth by the BAP in *Gavia*. *See In re Ford*, 84 B.R. 40, 44 (Bankr.E.D.Pa.1988) (stating that modest and reasonable delays of payments to secured creditors were acceptable). On the other hand, in the Chapter 11 context, we recently denied confirmation of a plan of a debtor who requested a five-month payment hiatus from her primary secured creditor, on the ground that a history of lack of success in marketing the property in issue rendered the plan infeasible. *In re Calvanese*, 169 B.R. 104, 107–09 (Bankr.E.D.Pa.1994).

We also note with interest a lengthy recent discussion of the issue of sale plans in Chapter 13 cases in *In re Newton*, 161 B.R. 207, 216–18 (Bankr.D.Minn.1993). The *Newton* court concludes as follows, *id.* at 217–18:

> For a proposed cure-by-sale to pass muster, the debtor must make certain objective commitments in the plan, and meet any objection to confirmation by shouldering the burden of production of evidence at a hearing. The plan should specify the terms under which the debtor proposes to

---

1. § 1322. **Contents of Plan**
   (a) The plan shall—

   . . . . .

   (8) provide of payment of all or part of a claim against the debtor from property of the estate or property of the debtor; . . .

market the property, including the listing price and the length and commencement date of the listing agreement. It also should incorporate a default remedy to relieve the affected mortgagee(s) from the automatic stay, if the sale does not close by the end of the proposed cure period. If an affected mortgagee objects to confirmation, the debtor must produce evidence as to past marketing efforts, the state of the market for the subject asset, current sale prospects, the existence and maintenance of any "equity cushion" in the property, and all other circumstances that bear on whether the creditor will see its way out of the case financially whole. If the debtor cannot produce anything more than remote speculation as to the terms or date of a sale; if market conditions are eroding the value of the collateral; if the debtor's efforts at a sale are not directed or energetic enough; or if any other factors demonstrate that the creditor will not receive the value of its secured rights within a circumscribed, specified, and "reasonable" cure period, the court cannot confirm the plan. *E.g., In re Gavia,* 24 B.R. at 574; *In re Seem,* 92 B.R. 134, 135–36 (Bankr.E.D.Pa. 1988); *In re Hogue,* 78 B.R. at 872–73; *In re Vieland,* 41 B.R. 134, 140–41 (Bankr. N.D.Ohio 1984); *In re Tucker,* 34 B.R. 257, 262–63 (Bankr.W.D.Okla.1983).

■ We note that the foregoing conclusions appear after a review of most of the cases cited herein by the *Newton* court, and also appear after a discussion by that court of the burden of proof in Chapter 13 confirmation cure plans generally, in which the court holds that the burden of proof in such instances lies upon the debtor. *Id.* at 212–15. Although not embracing the bright-line tests enunciated elsewhere in *Newton,* we have recognized in the past that, in the face of objections to confirmation pursuant to 11 U.S.C. §§ 1325(a)(3), (a)(5), and (a)(6), the ultimate burden of proof falls upon the debtor. *In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa.1990).

■ From the foregoing, we find ourselves disinclined to adopt the broad-based condem-

nation of sale plans dictated by the BAP decisions and their progeny cited at page 756 *supra.* We expressly reject the invocation of §§ 1322(b)(2) and (b)(5) in this context. Sale plans generally do not *per se* modify secured creditors' rights; they merely delay immediate payment to creditors in consideration for what is often accelerated full payment. We agree with the holding of *Ratmansky* that § 1322(b)(8), appearing as it does directly after §§ 1322(b)(2) and (b)(5), clarifies that a sale plan is not contrary to the limitations and modifications of mortgages addressed elsewhere in § 1322(b).

Rather, we believe that a feasibility-based analysis, similar to that adopted in *Calvanese* and other cases cited therein, at 109 B.R. at 108, in the Chapter 11 context, is appropriately applied to Chapter 13 sale plans. The checklist of "commitments" recited in *Newton, supra,* 161 B.R. at 217–18, quoted at pages 756–57 *supra,* seems very well-taken.

■ The Debtors' instant Plan falls woefully short of making the "commitments" recited in *Newton.* The Plan fails to specify the terms of its listing for sale. It makes no statement regarding remedies accorded to the secured creditors of the projected sale is unsuccessful. *Compare Calvanese, supra,* 169 B.R. at 109 (confirmation denied when debtors failed to expressly allow the objecting creditor to foreclose if the projected sale were unsuccessful). The Plan states no terms of, and no time period for, the contemplated sale. It is not at all clear, from a review of the Plan, what would happen after the twelve months of payments runs, which period, it should be noted, began to run 45 days after the case was filed, *see In re Cobb,* 122 B.R. 22, 27 (Bankr.E.D.Pa.1990), and hence would expire in May, 1995. The plan could certainly be read as keeping matters in a suspended state for three or four more years thereafter, with the Debtors' obligation to make payments suspended in the meantime. Finally, there is little prospect of an imminent sale at a price sufficient to pay off even the Debtors' secured creditors.[2] The

2. We also note that the Plan does not appear to provide for the full payment of all priority claims, which could render it unconfirmable under 11 U.S.C. § 1322(a)(2).

realty has failed to elicit an offer which the Debtors have deemed acceptable after a year on the market, and the Husband presented no evidence of any dramatic events likely to change the bleak status quo.

■ Were it not for the extensive history of this case, and the entry of two Orders making it clear that failure to achieve confirmation on January 19, 1995, would necessarily result in precluding the Debtors from making any such further efforts, we would probably allow the Debtors to amend their plan at this juncture. The issue of the circumstances in which Chapter 13 sale plans will be confirmed in this court has not been recently addressed in detail heretofore, and the Debtors should ordinarily get some opportunity to comply with recently-announced policies. However, the outcome here was not unpredictable, as most of the caselaw cited herein has existed for some time, even though it was perhaps not collected in one place heretofore. More importantly, our Orders setting a final confirmation hearing deadline dates must be enforced, as such orders are not entered very frequently and only when necessary, because entry of such orders adds to our own labors. *See In re Hadley,* 1994 WL 96969, slip op. at *6–*7 (Bankr.E.D.Pa. March 23, 1994).

We will allow the Debtors a brief period to convert their case to Chapter 7 if they so choose, because, as we observed at the hearing, a Chapter 13 sale plan is very much like a Chapter 7 liquidation, and it would be wasteful to require a refiling simply for the Debtors to choose another Chapter of the Code under which to proceed. *See also In re Lennon,* 65 B.R. 130, 132 (Bankr.N.D.Ga. 1986) ("by funding a plan through liquidation, the legislative purpose of debtor rehabilitation is frustrated and the distinction between Chapter 13 and Chapter 7 is practically eliminated"). *Compare Hadley, supra,* slip op. at *6–*7 (a Chapter 13 case which had been previously twice converted will be irrevocably dismissed on failure to achieve confirmation by a prescribed date).

### D. CONCLUSION

An Order consistent with the foregoing Discussion will be entered.

*ORDER*

AND NOW, this 25th day of January, 1995, after a fifth continued Confirmation hearing and a second continued hearing on the Trustee's Motion to Dismiss this case for infeasibility on January 19, 1995, in light of our Orders of October 21, 1994, and December 8, 1994, it is hereby ORDERED AND DECREED as follows:

1. Confirmation of the Debtors' Amended Plan, filed on October 19, 1994, is DENIED.

2. The Debtors shall be allowed until January 31, 1995, to convert their case to Chapter 7 if they so choose. If no conversion request is filed on or before that date, this case will be dismissed.